# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| JEAN FRANCIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-0964 (ESH) |
| | ) | |
| THOMAS E. PEREZ,[1] | ) | |
| | ) | |
| Defendant. | ) | |

_____ )

## MEMORANDUM OPINION

Plaintiff Jean Francis, a Seventh Day Adventist, has sued Thomas Perez, Secretary of the Department of Labor ("DOL"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* She alleges that she was discriminated against by her superiors on the basis of religion, refused a reasonable accommodation for her religious practices, and retaliated against for complaining about her supervisors' alleged discrimination. Before the Court is defendant's Motion for Summary Judgment. For the reasons stated below, this motion will be granted.

## FACTUAL BACKGROUND

Plaintiff is a Seventh Day Adventist who observes the Sabbath from sunset on Fridays to sunset on Saturdays. (Aff. of Jean Francis, Dec. 3, 2009 [Def.'s Ex. 9] at 2, 4.) From June 10, 2007 to June 21, 2009, plaintiff was the Chief of the Branch of Budget Formulation and Implementation of the Office of Management, Administration and Planning in the Employment Standards Administration ("ESA") of the DOL. (Statement of Material Facts as to Which There

_____

[1] Pursuant to Fed. R. Civ. P. 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the Court will automatically substitute that officer's successor. Accordingly, the Court substitutes Thomas E. Perez for Hilda L. Solis.

is No Genuine Dispute ("SOF"), May 9, 2013 [Dkt. No. 16-2] ¶ 1.)  The Vacancy

Announcement for the Budget Branch Chief position listed as a "Key Requirement" that the

position "[r]equires long work hours to meet the demands of the office."  (*Id.* ¶ 22.)  During

plaintiff's interview for the position, Charlene Dunn, Director of the Division of Financial

Management and Acting Budget Branch Chief, gave an example of the "long hours" advertised

in the vacancy announcement by relating a recent experience when the budget team worked from

Friday evening straight through to Saturday afternoon.  (SOF ¶ 5; Dep. of Charlene Dunn

("Dunn Dep."), March 4, 2011 [Pl.'s Ex. 2; Def.'s Ex. 8] at 23-24.)  Anne Baird-Bridges,

Director of the Office of Management, Administration and Planning, also participated in

plaintiff's interview.  (SOF ¶ 3; Aff. of Anne Baird-Bridges ("Baird-Bridges Aff."), Jan. 15,

2010 [Pl.'s Ex. 4; Def.'s Ex. 3] at 4.)  Both Mss. Dunn and Baird-Bridges claim Christianity as

their religious affiliation.  (SOF ¶¶ 4, 7.)  Although plaintiff was not Ms. Baird-Bridges's "first

choice" (Baird-Bridges Aff. at 4), plaintiff was selected for the position.

After plaintiff was selected, Ms. Dunn sent her a box of documents pertaining to the

budgets, policies, and software unique to DOL for plaintiff's review prior to starting work.  (SOF

¶ 26.)  Plaintiff did not review all of the materials prior to beginning her position with DOL (*id.* ¶

27), because she was still working for the Department of Homeland Security at the time.  (Dep.

of Jean Francis ("2011 Francis Dep."), March 15, 2011 [Pl.'s Ex. 3; Def.'s Ex. 2] at 61-62.)

On plaintiff's first day of work, ESA was in the process of preparing the OMB budget

submission.  (SOF ¶ 29.)  Ms. Dunn instructed plaintiff to focus her attention on inputting the

budget into the Departmental E-Budgeting System ("DEBS").  (*Id.* at ¶¶ 30-31.)  On Friday, June

22, 2007, plaintiff and her staff continued inputting the budget into the DEBS.  (*Id.* at ¶ 32.)

Plaintiff arrived at work around 6:30 a.m. and left at 8:30 p.m., although several of her staff,

along with Ms. Dunn, remained working. (Dep. of Jean Francis ("2013 Francis Dep."), March 5, 2013 [Pl.'s Ex. 8; Def. Ex. 20] at 41-42; SOF ¶¶ 32-33.)

On Monday June 25, 2007, Mss. Dunn and Baird-Bridges met with plaintiff to discuss why she left before her staff the previous Friday evening. (SOF ¶ 34.) In response, plaintiff informed her supervisors for the first time that, as a Seventh Day Adventist, she was unavailable to work from Fridays at sunset to Saturdays at sunset because that was her Sabbath. (*Id.* at ¶¶ 34-35; Dunn Dep. at 46.) Ms. Baird-Bridges asked "so if I ask you to come in on your Sabbath, you're not coming in?" (2013 Francis Dep. at 45.) Plaintiff responded that she could come in Saturdays after sunset or all day Sundays. (*Id.*) To that response, Ms. Dunn stated that "Fridays are busy times and you have to work on Fridays" (*id.*), and Ms. Baird-Bridges stated "if I had known that during the interview, I would have made other arrangements." (Dunn Dep. at 46; *see also* 2013 Francis Dep. at 45.) Ms. Baird-Bridges further informed plaintiff that her inability to work on Friday evenings and Saturdays was going to interfere with her ability to "fulfill the responsibilities of her supervisory position." (SOF ¶ 38; Dunn Dep. at 54). After that meeting, neither plaintiff's religion nor her inability to work during her Sabbath was discussed again. (SOF ¶ 40; *see* 2011 Francis Dep. at 73; *see also infra* n.5.)[2]

On July 24, 2007, plaintiff met with Mss. Dunn and Baird-Bridges to discuss Ms. Dunn's departure from the DOL and to convey Ms. Baird-Bridges's expectations of the plaintiff vis-à-vis the budget. (SOF ¶ 50.) During the meeting, Ms. Baird-Bridges asked plaintiff why she had not, as requested, met with Ms. Dunn on a daily basis to discuss the budget or otherwise proactively assumed the duties of her new position. (Aff. of Charlene Dunn ("Dunn Aff."), Feb. 2, 2010

---

[2] It is unclear whether this is because plaintiff chose to work during the Sabbath or whether the budget process did not again require her or her staff to work during those times. However, the fact that the issue of her inability to work during her Sabbath did not again arise after June 25, 2007, is undisputed, as is the fact that plaintiff's inability to work on the Sabbath was not cited as a deficiency in any of her performance reviews. (SOF ¶ 24.)

[Pl.'s Ex. 9] at 3.) Plaintiff responded by alleging that Ms. Dunn had not assisted her or offered to help. (*Id.*) In response, Ms. Dunn said that plaintiff was the "most arrogant person she had ever met." (2013 Francis Dep. at 56; Dunn Aff. at 3.) After the meeting, Ms. Baird-Bridges sent plaintiff an e-mail summarizing her concerns with plaintiff's performance and questioning how plaintiff would "get the budget done." (SOF ¶ 51; E-mail from Anne Baird-Bridges to Jean Francis, July 27, 2007 [Def.'s Ex. 15] at 1.) The e-mail noted that plaintiff had not immersed herself in the budget process, had failed to meet with Ms. Dunn when asked to, had failed to comply with instructions to gain program orientation, and had relied on her staff to make policy decisions that they were unqualified to make. (SOF ¶ 52.) Charlene Dunn retired from the DOL on August 17, 2007. (*Id.* ¶ 8.)

Shortly after the July 24, 2007 meeting, plaintiff verbally complained to Dixon Mark Wilson, then-Deputy Assistant Secretary of ESA, that she was "subject to unwelcome, offensive, and unprofessional behavior by Anne Baird-Bridges." (Aff. of Dixon Mark Wilson ("Wilson Aff."), Jan. 11, 2010 [Pl.'s Ex.11] at 5.) Mr. Dixon discussed with Ms. Baird-Bridges her "management style and behavior" during her annual and mid-year performance reviews. (*Id.*) Mr. Wilson left the ESA in January 2009. (*Id.*)

On November 1, 2007, Deputy Chief and Acting Budget Branch Chief Bruce Bohanon prepared plaintiff's performance appraisal for fiscal year ("FY") 2007, which Ms. Baird-Bridges reviewed and signed. (SOF ¶ 53; FY 2007 Performance Appraisal, Nov. 1, 2007 [Def.'s Ex. 13].) The appraisal gave plaintiff an overall "effective" rating, with a "meets" expectations rating in six categories, and an "exceeds" expectations rating in two categories. (FY 2007 Performance Appraisal at 1-2.)[3] The written portion of the appraisal praised many aspects of

---

[3] An "effective" rating means that the appraisee "[m]eets standards for all elements and may exceed standards for less than 50% of elements." (FY 2007 Performance Appraisal at 1.) Plaintiff "met"

plaintiff's work, including that she had "taken the initiative to take introductory supervisory courses to fully prepare herself for the challenges of supervision" and exhibited "excellent oral and written communication skills." (*Id.* at 11.) However, the appraisal also provided several recommendations for plaintiff's improvement, including that plaintiff "need[ed] to focus on handling a multitude of tasks quickly," "needed to focus on increasing her consistent responsiveness to" her supervisors, and that "she should seek advice . . . and take advantage of institutional knowledge and specific directives as she responds to questions, issues and concerns." (*Id.* at 11-12.) Plaintiff refused to sign the performance appraisal (*id.* at 1) and wrote a two-page comment describing why she concluded that her "rating [was] not an accurate assessment of her performance." (*Id* at 13-14.)

On November 13, 2007, Janice Blake-Green replaced Mr. Bohanon as the Director of the Division of Financial Management. (SOF ¶¶ 9, 59.) One of Ms. Blake-Green's roles as director was to approve almost all of the documents pertaining to the ESA where funds were involved. (*Id.* ¶ 60.) Upon starting her position, Ms. Blake-Green met with Ms. Baird-Bridges to discuss the staff, including plaintiff. (Dep. of Janice Blake-Green ("Blake-Green Dep."), March 4, 2011 [Pl.'s Ex. 14; Def.'s Ex. 14] at 16.) Ms. Baird-Bridges indicated to Ms. Blake-Green that she "had some concerns about [plaintiff] and the performance of the budget duties, but she was hopeful that with [Ms. Blake-Green's] management styles, things would be turned around." (*Id.*) Ms. Baird-Bridges further informed Ms. Blake-Green that plaintiff had "problems[] with meeting

---

standards for (1) "leadership," (2) "resource management," (3) "coalition building," (4) "meet[ing] federal financial, budgeting and accounting requirements," (5) "ensur[ing] the timely and accurate development of ESA's integrated budget," and (6) "ensur[ing] that ESA funds are administered and controlled to meet financial standards and program mission and that ESA remains solvent." (*Id.* at 2.) Plaintiff "exceeded" standards for (1) "problem solving and initiative" and (2) "acknowledg[ing], understand[ing], and correctly prioritiz[ing] customer needs, and develop[ing] an appropriate course of action leading to a productive solution." (*Id.*)

deadlines" and that "[s]he did not believe [plaintiff] was capable of fulfilling her responsibilities as the budget chief." (*Id.* at 18-19.)

On January 8, 2008, Ms. Baird-Bridges copied Ms. Blake-Green on an e-mail sent to plaintiff seeking confirmation that an employment report had been completed. (SOF ¶ 63.)[4] Ms. Blake-Green investigated and found that the employment report, which was plaintiff's responsibility, had not been completed. (*Id.* ¶ 64.) The next evening, Ms. Blake-Green requested the report from plaintiff that night. (2013 Francis Dep. at 70-71.) Plaintiff told Ms. Blake-Green that the report was delayed because one of the programs was late in submitting a budget. (*Id.* at 72.) Plaintiff then recommended to Ms. Blake-Green that she "[c]ome in some time and see what we're doing so you can get the hang of what it takes to get this thing done." (*Id.* at 75.) Ms. Blake-Green responded by pointing her finger in plaintiff's face and stating "you come to me, I don't come to you." (*Id.*) Shortly after that incident, Ms. Blake-Green sent plaintiff an e-mail instructing her to "factor in time for ESA management to review the budget prior to submission," and that she "expect[ed] [plaintiff] to come to [her] with concerns – not the other way around." (SOF ¶ 66.)

On February 7, 2008, Ms. Blake-Green called plaintiff into her office. Ms. Blake-Green stated that she "didn't really want to do this, but [Ms. Baird-Bridges] want[ed] [her] to" (2013 Francis Dep. at 79), at which point she gave plaintiff a memorandum documenting "supervisory concerns" with plaintiff's work. (SOF ¶ 67; Supervisory Concerns ("Feb. 2008 Mem."), Feb. 7, 2008 [Def. Ex. 18] at 1.) The memorandum cited Mss. Blake-Green and Baird-Bridges's

<hr />

[4] At several points in her opposition to the Secretary's motion for summary judgment, plaintiff states that she "disputes the facts contained in" portions of the Secretary's Statement of Facts. (*See, e.g.*, Pl.'s Opp'n to Def.'s Mot. for Summ. J., July 9, 2013 [Dkt. No. 19] at 9.) A non-moving party's mere statement that she "disputes" a fact supported by evidence is insufficient to actually put that fact in dispute for summary judgment purposes; rather, the non-moving party must provide evidence to show that the fact is genuinely disputed. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

concerns regarding, *inter alia*, plaintiff's "ability to manage multiple projects at one time," to "establish[] priorities, develop[] realistic and meaningful plans and timeframes and then follow[] through," to communicate, to "manag[e] staff," and to exercise judgment. (Feb. 2008 Mem. at 1-2.)

On May 28, 2008, Ms. Blake-Green gave plaintiff her mid-term progress review. (SOF ¶ 70.) The mid-term progress review further documented many of the "supervisory concerns" raised in the February memorandum. (Mid-Term Progress Review ("2008 Mid-Term Progress Review"), May 28, 2008 [Def.'s Ex. 19] at 1; *see* SOF ¶ 70.) Notwithstanding the concerns outlined in the February memorandum and the May mid-term progress review, Ms. Blake-Green retained plaintiff in her supervisory position beyond the initial probationary period. (Blake-Green Dep. at 36-37.) Ms. Blake-Green believed that she and plaintiff "could work through some of the issues," and if plaintiff's performance improved, it would be a "win-win situation." (SOF ¶ 68; Blake-Green Dep. at 37.) Although she did not agree with the decision, Ms. Baird-Bridges deferred to Ms. Blake-Green's determination that plaintiff should remain in her supervisory position. (Blake-Green Dep. at 38.)

In October 2008, Serge Louis was hired as a Lead Budget Analyst to be supervised by plaintiff. (Aff. of Serge Louis, Dec. 6, 2012 [Pl.'s Ex. 17] at 1.) While discussing office coverage with Ms. Blake-Green, Mr. Louis informed Ms. Blake-Green that he would be unable to work some evenings beyond 6:00 p.m. because he was a Jehovah's Witness. (Aff. of Serge Louis ("2009 Louis Aff."), Dec. 21, 2009 [Pl.'s Ex. 18] at 1.) Ms. Blake-Green asked Mr. Louis whether he was "one of those who can't work on Friday evenings and Saturdays," to which Mr. Louis responded "no, [he] would be available to work late . . . on weekends, if necessary." (*Id.*)

Ms. Blake-Green asked Mr. Louis to report to her about plaintiff's activities at work, which he did for some time. (*Id.*)

In early November 2008, Ms. Blake-Green prepared, and Ms. Baird-Bridges reviewed and signed, plaintiff's FY 2008 performance appraisal. (SOF ¶ 71; FY 2008 Performance Appraisal, Nov. 5, 2008 [Pl.'s Ex. 16; Def.'s Ex. 10].) The appraisal gave plaintiff an overall "effective" rating, with a "meets" expectations rating in seven categories and an "exceeds" expectations rating in one category. (FY 2008 Performance Appraisal at 1-2.) The written portion of the appraisal offered several recommendations for plaintiff's improvement, including that plaintiff needed to "become more engaged in the actual budget operations," "consistently keep her management chain informed of issues or concerns," and "understand how such [financial] reports are prepared and secure access to the necessary systems so that she can be in a position to monitor the funds and prepare the required reports in the absence of staff." (*Id.* at 11-12.)

On March 17, 2009, Ms. Blake-Green, with Ms. Baird-Bridges's approval, provided plaintiff with a Written Notification of Unacceptable Performance and placed plaintiff on a Performance Improvement Plan ("PIP"). (SOF ¶ 76; Notification of Unacceptable Performance/Performance Improvement Plan ("PIP"), March 17, 2009 [Def.'s Ex. 11].) The PIP determined that plaintiff was "performing at an unacceptable level" in the areas of "leadership," "problem solving and initiative" and executing the budget "in a manner that meets federal financial, budget and accounting requirements." (PIP at 1.) The PIP further apprised plaintiff of the "required activities and the level of performance [she] must attain to demonstrate performance" at the "retention" level. (*Id.* 1-2) Plaintiff's PIP period would run for ninety days

from its issuance, at which time Ms. Blake-Green would reassess plaintiff's performance. (*Id.* at 1.)

Plaintiff refused to sign the PIP (*id.* at 2), and thereafter, she submitted a four-page response memorandum to Mss. Blake-Green and Baird-Bridges. (*Id.* at 8-11.) The response memorandum alleged that the PIP's statements regarding plaintiff's performance were "vague and ambiguous" and unsupported by "specific examples." (*Id.* at 8-9.) In her response, plaintiff also critiqued her supervisors and claimed she "ha[d] been consistently *harassed* on the job" since the February 7, 2008 memorandum. (*Id.* at 10 (emphasis in original).) Plaintiff further alleged that "the harassment has continued in the form of [the] proposal to place [her] on a Performance Improvement Plan." (*Id.* at 11.)

In early April 2009, plaintiff prepared to go on leave for several weeks for a residency required for her doctoral degree. (2011 Francis Dep. at 129-31.) Before she left, plaintiff informed Ms. Blake-Green that she had "everything in place" for submitting the budget on time. (*Id.* at 133-34.) However, plaintiff failed to provide Ms. Blake-Green or her subordinates with a critical document necessary for the completion of the budget. (Aff. of Janice Blake-Green ("Blake-Green Aff."), Jan. 30, 2010 [Pl.'s Ex. 13; Def.'s Ex. 6] at 6-7.) Once Ms. Blake-Green became aware of the document, the staff "had to scramble to complete the action by the due date." (*Id.* at 7.) On April 22, 2009, the Office of the Assistant Secretary for Administration threatened to put the ESA into receivership because a component of the Congressional Budget Justification was a week overdue. (SOF ¶ 87.) Ms. Blake-Green had to take over supervision of the budget from plaintiff to get it submitted that day. (*Id.* ¶ 88.)

On May 7, 2009, Ms. Blake-Green informed plaintiff that she "would not be granted a within-grade-increase to GS15, Step 2 . . . on June 7, 2009" (Notice of Negative Determination

Regarding Within Grade Increase, May 7, 2009 [Def.'s Ex. 27] at 1), because plaintiff "was still on the PIP." (Blake-Green Aff. at 13.) The notice informing plaintiff of the denial of her within-grade-increase stated that "[i]f [plaintiff's] performance improves to the 'Effective' level at the conclusion of the PIP period, then your [within-grade-increase] will be made effective retroactively to the original due date." (Notice of Negative Determination at 1.)

At the end of the PIP period, Mss. Baird-Bridges and Blake-Green determined that plaintiff had not demonstrated the improvement required under the PIP. (SOF ¶ 90.) On June 22, 2009, Ms. Baird-Bridges reassigned plaintiff to a non-supervisory position at the same grade level by creating a Special Assistant position for her in the Office of the Director. (SOF ¶ 96.) Ms. Baird-Bridges provided plaintiff a memorandum explaining that she had received "a rating of 'fail' for each of the elements covered in the PIP," and thus, "management ha[d] decided to reassign [her] to a non-supervisory GS-15 position." (Completion of Performance Improvement Plan, June 22, 2009 [Def.'s Ex. 30] at 1.) The memorandum further explained the "fail" rating:

> During the period covered by the PIP, regular progress meetings were held and feedback was provided in an effort to assist you in demonstrating improvement. Unfortunately, improvement was not demonstrated, and we were actually threatened with receivership for the lack of a timely FY 2010 Budget submission. You have not fully engaged yourself in the operations of the Branch and are therefore, unable to effectively provide the leadership necessary to ensure successful performance of Budget functions. You also did not achieve the other performance items outlined in the PIP as necessary to reach the "Need to Improve Level."

(*Id.*) Plaintiff was relocated from her office to a cubicle outside of Ms. Baird-Bridges' office and near the other manager, Deputy Director Deborah Becker, for whom she would work. (SOF ¶¶ 97, 100.) In plaintiff's performance review for the fiscal year ending September 30, 2009, which included plaintiff's reassignment to the Special Assistant position, Ms. Becker gave plaintiff an overall "effective" rating. (*Id.* ¶ 99.) Ms. Becker was plaintiff's supervisor until November

2009, when the ESA dissolved and plaintiff was reassigned to a position within the Departmental Budget Office.  (*Id.* ¶¶ 100-04.)

On October 9, 2009, plaintiff filed an informal complaint with the EEOC alleging discrimination on the basis of national origin and religion.  Plaintiff alleged discrimination (1) when she was placed on the PIP; (2) when she was informed that she was not granted a scheduled within-grade increase; (3) when she was notified that she failed each element covered in the PIP; (4) when she was reassigned to a non-supervisory GS-15 position; and (5) when she was removed from her office and assigned to a cubicle.  The EEO Investigator assigned to the case filed her investigative summary on March 31, 2010.  (*See* EEO Investigative Summary, March 31, 2010 [Pl.'s Ex. 10] at 1.)

On June 13, 2012, plaintiff filed a Title VII action against the Secretary alleging denial of a reasonable religious accommodation, discrimination based on religion, and discrimination based on national origin, and retaliation.  (Compl., June 13, 2013 [Dkt. No. 1] at 8-11.)  Plaintiff has since withdrawn her claim based on national origin.  (Consent Mot. for Withdrawal of Claim, Apr. 5, 2013 [Dkt. No. 15].)  Now that discovery has been completed, the Secretary has moved for summary judgment as to the remaining counts of religious discrimination and retaliation. (Def.'s Mot. for Summ. J., May 9, 2013 [Dkt. No. 16].)

## ANALYSIS

### I.      STANDARD OF REVIEW

A motion for summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  There is a genuine dispute

as to a material fact if a "'reasonable jury could return a verdict for the nonmoving party.'" *Galvin v. Eli Lilly & Co.,* 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting *Anderson,* 477 U.S. at 248). A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. Dist. of Columbia,* 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255. However, the non-moving party "may not rely merely on allegations or denials in its own pleading," *see* Fed.R.Civ.P. 56(c), but instead must offer specific facts showing that genuine issues exist for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). While summary judgment "must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Bolden v. Winter,* 602 F. Supp. 2d 130, 136 (D.D.C. 2009) (internal quotation marks omitted).

## II.     REASONABLE ACCOMODATION

Plaintiff first claims that defendant discriminated against her by denying her request for a religious accommodation to observe the Sabbath from Friday at sunset to Saturday at sunset. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), July 9, 2013 [Dkt. No. 19] at 20.) The Secretary argues that plaintiff fails to establish a prima facie reasonable accommodation claim under 42 U.S.C. § 2000e(j). (Def.'s Mem. of P. & A. in Support of Mot. for Summ. J. ("Def.'s Mem."), May 9, 2013 [Dkt. No. 16-1] at 20.)

Under Title VII, it is an "unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977); *see* 42 U.S.C. § 2000e(j) (defining "religion" to include "all aspects of religious observance and practice . . . unless an employer demonstrates that he is unable to accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."). To establish a prima facie case of discrimination based on a failure to provide a reasonable accommodation, plaintiff must show that she (1) "'held a bona fide religious belief conflicting with an employment requirement'"; (2) informed her employer of her belief; and (3) faced an adverse employment action due to her "'failure to comply with the conflicting employment requirement.'" *See E.E.O.C. v. Rent-A-Ctr., Inc.*, 917 F. Supp. 2d 112, 116 (D.D.C. 2013) (quoting *Isse v. Am. Univ.*, 540 F. Supp. 2d 9, 29 (D.D.C. 2008)). "Once a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to show that it was unable reasonably to accommodate the plaintiff's religious needs without undue hardship." *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 95 (D.D.C. 2006) (internal quotation marks omitted). In this regard, Congress "did not impose a duty on the employer to accommodate at all costs." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986). Instead, the Supreme Court has instructed that an accommodation causing anything "more than a *de minimis* cost" to the employer's business constitutes an "undue hardship." *Trans World Airlines*, 432 U.S. at 84; *see also Rent-A-Ctr.*, 917 F. Supp. 2d at 117.

Plaintiff argues that defendant failed to accommodate her observance of the Sabbath from sunset Fridays to sunset Saturdays and thereafter took adverse actions against her by "issuing disciplinary memoranda, put[ting her] on a PIP, den[ying] a within-grade pay increase, and

ultimately, strip[ing her] of her supervisory position." (Pl.'s Opp'n at 22.) The Secretary concedes the first two elements of plaintiff's prima facie case, but he argues that plaintiff does not make the required showing under the third element. (Def.'s Mem. at 20.) The Court agrees.

Plaintiff's testimony that on June 25, 2007, she requested Friday evenings and Saturdays off to observe the Sabbath, and that Ms. Baird-Bridges denied that request (*see* 2011 Francis Dep. at 10-11, 65) is sufficient at this stage to establish that plaintiff was denied a religious accommodation. However, the denial of a religious accommodation does not suffice to establish a prima facie case. Plaintiff must also show that after the denial, she "fail[ed] to comply with the conflicting employment requirement" and was thus subjected to an adverse employment action. *See Rent-A-Ctr.*, 917 F. Supp. 2d at 112. Here, there is *no* evidence that *after* Ms. Baird-Bridges denied plaintiff's request for a religious accommodation, plaintiff ever failed to comply with the conflicting employment requirement by missing work on a Friday evening or Saturday when her presence was otherwise required.[5] "[T]herefore, plaintiff cannot – and does not – show that [s]he was either disciplined or threatened with discipline as a result of the conflict between [her] religious belief and [her] employment requirements." *Isse*, 540 F. Supp. 2d at 29; *see Thompson v. Kaufman's Bakery, Inc.*, 2005 WL 643433, at *8 (W.D.N.Y. Mar. 16, 2005); *Stone v. West*, 133 F. Supp. 2d 972, 985 (E.D. Mich. 2001).[6] For this reason, plaintiff's reasonable accommodation claim must be dismissed.

---

[5] Indeed, when asked in deposition whether her ability to work during the Sabbath came up again after the June 25, 2007 meeting, plaintiff stated that "the only time it came up was when Serge Louis came on board, [and] Janice Blake-Green asked him if he was one of them who couldn't work on a Friday night or on a Saturday." (2011 Francis Dep. at 73.)

[6] The events on Friday June 22, 2007, although constituting a "failure to comply with the conflicting employment requirement," do not provide a basis for a reasonable accommodation claim. When plaintiff left work that evening, she had not yet informed her employer of her religious beliefs or her observance of the Sabbath from sunset Fridays to sunset Saturdays. (*See* Dunn Dep. at 41-42; *see id.* at 45.) The duty of an employer to reasonably accommodate an employee's religious beliefs or practices

## III.   DISCRIMINATION

Plaintiff also argues that she was discriminated against on the basis of her religion.  (Pl.'s Opp'n at 27.)  In particular, plaintiff alleges that because she is a Seventh Day Adventist, the defendant (1) issued the February 2008 "supervisory concerns" memorandum, (2) issued the May 2008 mid-year progress review documenting "supervisory concerns", (3) placed plaintiff on a PIP, (4) denied plaintiff's within-grade increase, and (5) removed plaintiff from her supervisory position.  (*Id.* at 27, 29.)  Defendant responds that many of the challenged actions are not actionable as adverse actions (Def.'s Mem. at 6), and that the challenged actions were taken not because of plaintiff's religious beliefs, but because her "supervisors did not have confidence in Plaintiff's ability to do the budget."  (*Id.* at 19.)

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, condition, or privileges of employment, because of such individual's . . . religion."  42 U.S.C. § 2000e–2(a)(1).  There are two essential elements of a religious discrimination claim under Title VII: "that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . religion . . . ." *Baloch v. Kempthorne,* 550 F.3d 1191, 1196 (D.C. Cir. 2008).

Under the framework first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05 (1973), a plaintiff "must [first] establish a prima facie case of discrimination."  *Reeves v.*

---

only attaches after the employee has informed the employer of that belief or practice.  *See* 29 C.F.R. § 1605.2(c)(1) ("After an employee or prospective employee notifies the employer or labor organization of his or her need for a religious accommodation, the employer or labor organization has an obligation to reasonably accommodate the individual's religious practices.").  Thus, any alleged adverse actions resulting from plaintiff's early departure that weekend are not actionable under a reasonable accommodation claim.  *See Pledger v. Mayview Convalescent Home, Inc.*, 2009 WL 1010428, at *13 (E.D.N.C. Apr. 14, 2009) ("[Defendant's] non-compliance with a request of which it was unaware cannot be the basis of a claim of refusal to accommodate one's religious beliefs in the workplace.").

*Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000). However, "[i]n a Title VII

disparate-treatment suit where an employee has suffered an adverse employment action and an

employer has asserted a legitimate, non-discriminatory reason for the decision, the district court

need not – *and should not* – decide whether the plaintiff actually made out a prima facie case

under *McDonnell Douglas.*" *Brady v. Office of Sgt. at Arms,* 520 F.3d 490, 494 (D.C. Cir. 2008)

(emphasis in original). Instead, "the district court must resolve one central question: Has the

employee produced sufficient evidence for a reasonable jury to find that the employer's asserted

non-discriminatory reason was not the actual reason and that the employer intentionally

discriminated against the employee on the basis of race, color, religion, sex, or national origin?"

*Id.*; *Lathram v. Snow,* 336 F.3d 1085, 1088 (D.C. Cir. 2003) ("[T]o survive summary judgment

the plaintiff must show that a reasonable jury could conclude from all of the evidence that the

adverse employment decision was made for a discriminatory reason.").

    The evidence a court must consider includes (1) plaintiff's prima facie case, (2) any

evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further

evidence of discrimination that may be available to the plaintiff. *Waterhouse,* 298 F.3d at 992–

93 (citing *Aka v. Wash. Hosp. Ctr.,* 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)). A plaintiff

need not present evidence in each of these categories to avoid summary judgment. *Aka,* 156

F.3d at 1289. Rather, the court should assess the plaintiff's challenge to the employer's

explanation in light of the totality of the circumstances of the case, keeping in mind that "[i]t is

permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the

employer's explanation." *Reeves,* 530 U.S. at 147.

    A plaintiff may, however, bypass the *McDonnell Douglas* framework altogether by

presenting so-called "direct evidence" – expressions by the decision maker that evidence of

discriminatory intent without any need for inference.  *Walker v. England*, 590 F. Supp. 2d 113, 137 n.16 (D.D.C. 2008).  The existence of such evidence is sufficient alone to defeat a defendant's motion for summary judgment.  *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511 (2002) ("The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." (quoting *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985))); *see also Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013); *McGill v. Munoz,* 203 F.3d 843, 845 (D.C. Cir. 2000).

A.      **Adverse Employment Action**

Generally, once a defendant has proffered a legitimate, non-discriminatory reason for the challenged action, a court need not consider whether the plaintiff has established a prima facie case.  *Brady*, 520 F.3d at 494.  However, when – as here – defendant contests the existence of an adverse action, the court may consider that issue first.  *Franklin v. Potter*, 600 F. Supp. 2d 38, 63 (D.D.C. 2009); *see Baloch*, 550 F.3d at 1196-97 (engaging in adversity inquiry first).

"An 'adverse employment action' within the meaning of *McDonnell Douglas* is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)).  A plaintiff may demonstrate that she has suffered an adverse employment action by showing that she "'experience[d] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'"  *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C.Cir.2002)).  "'[P]urely subjective injuries,' such as dissatisfaction with a reassignment, or

public humiliation or loss of reputation are not adverse actions." *Holcomb v. Powell,* 433 F.3d 889, 902 (D.C.Cir.2006) (quoting *Forkkio,* 306 F.3d at 1130–31). But a "'reassignment with significantly different responsibilities' . . . generally indicates an adverse action." *Forkkio,* 306 F.3d at 1131 (quoting *Burlington Indus.*, 524 U.S. at 761).

The first actions that plaintiff claims were religiously discriminatory are the February 7, 2008 memorandum and the May 28, 2008 "mid-term progress review," both issued to plaintiff by Ms. Blake-Green. Both two-page memoranda "document[ed] supervisory concerns" with plaintiff's work. (Feb. 2008 Mem. at 1; 2008 Mid-Term Progress Review at 1.) As the D.C. Circuit has made clear, "while adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (internal quotation marks omitted). For this reason, "performance reviews typically constitute adverse actions only when attached to financial harms." *Baloch*, 550 F.3d at 1199; *see Weber v. Battista*, 494 F.3d 179, 185-86 (D.C. Cir. 2007) (holding that performance evaluations were "adverse actions insofar as they resulted in [plaintiff] losing a financial award or an award of leave"); *Brown v. Brody*, 199 F.3d 446, 458 (D.C. Cir. 1999) ("[A] thick body of precedent . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions."). In this case, plaintiff provides no evidence that either the February 7 or May 28, 2008 memorandum resulted in any financial harm to her. Accordingly, a reasonable jury could not conclude that these memoranda constitute "adverse actions."

Plaintiff next points to her placement on the PIP as an adverse action. For good reason, defendant does not argue that the PIP is non-adverse. "Generally, placement on a PIP is not, in

and of itself, an adverse employment action[;] rather placement on the PIP must have *resulted in* an adverse action, typically a change in the plaintiff's grade or salary." *Chowdhury v. Bair*, 604 F. Supp. 2d 90, 96 (D.D.C. 2009) (citations and internal quotation marks omitted); *see Taylor*, 350 F.3d at 1293 (concluding that placement on a PIP did not constitute an "adverse employment action" because plaintiff did not present evidence suggesting the PIP affected her grade or salary). In this case, however, it is clear that the PIP resulted in an adverse action. Ms. Blake-Green admits that she denied plaintiff's within-grade increase because plaintiff "was still on the PIP" (Blake-Green Aff. at 13; *see also* Baird-Bridges Aff. at 8-9), and the denial of a raise constitutes an adverse employment action. *See Johnson v. Dist. of Columbia*, 572 F. Supp. 2d 94, 108 (D.D.C. 2008), *amended on reconsideration in part*, 632 F. Supp. 2d 20 (D.D.C. 2009) ("The alleged failure to pay Johnson a salary increase based on his protected class status is well within the scope of an adverse employment action."). Accordingly, the PIP that caused the denial of plaintiff's within-grade increase constituted an adverse employment action.

Finally, plaintiff points to her reassignment as an adverse action. "Whether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question." *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007). In a case such as this, where plaintiff's reassignment did not entail "any loss of salary, grade level, or benefits," it constitutes a "lateral transfer." *See id.* at 364. Lateral transfers may constitute an adverse action if "plaintiff has 'raised a genuine issue as to whether the reassignment left [her] with *significantly different- and diminished*-supervisory and programmatic responsibilities.'" *Baloch*, 550 F.3d at 1196 (quoting *Czekalski*, 475 F.3d at 364 (emphasis added)); *see also Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002) ("[W]e have no doubt that the removal of Burke's supervisory responsibilities constituted an adverse employment action."). The Secretary concedes that

plaintiff was reassigned from a supervisory to a non-supervisory role.  (SOF ¶ 96.)  And there is

evidence that, although at the same grade level, the new position "required a different skill set

than the job [plaintiff] had formerly occupied" and included new responsibilities such as

"updat[ing] the Intranet."  (Baird-Bridges Aff. at 12.)  A reasonable jury could find that

plaintiff's reassignment brought about "significantly different- and diminished-supervisory"

responsibilities.  *See, e.g.*, *Burke*, 286 F.3d at 521-22; *Miles v. Kerry*, --- F. Supp. 2d. ---, 2013

WL 4454237, at *12 (D.D.C. Aug. 21, 2013); *Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 222

(D.D.C. 2010).  Accordingly, plaintiff has provided sufficient evidence to establish that her

reassignment constituted an adverse employment action.

### B.      Discrimination *vel non*

Defendant has offered a legitimate, non-discriminatory reason for the challenged adverse

actions, namely that plaintiff's job "performance was below acceptable levels, despite repeated

warnings that she must improve."  (Def.'s Mem. at 37.)  Thus, the "central question" is whether

"plaintiff has produced evidence sufficient for a jury to find . . . . 'that the defendant's

explanation is unworthy of credence' and that a jury could 'reasonably infer from the falsity of

the explanation that the employer is dissembling to cover up a discriminatory purpose.'"  *Primas

v. Dist. of Columbia,* 719 F.3d 693, 697 (D.C. Cir. 2013) (quoting *Reeves*, 530 U.S. at 147); *see

also Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) ("To answer this

question, we look to see if there is evidence from which a reasonable jury could find that the

employer's stated reason for the firing is pretext and any other evidence that unlawful

discrimination was at work.").  When considering this question, "a court must not act as 'a super-

personnel department that reexamines an entity's business decisions[.]'"  *Barnett*, 715 F.3d at

359 (quoting *Adeyemi v. Dist. of Columbia,* 525 F.3d 1222, 1227 (D.C.Cir.2008) (citation

omitted)).  Instead, "i[f] the employer's stated belief about the underlying facts is reasonable in

light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.

The Secretary produced extensive evidence documenting plaintiff's performance evaluations and concerns from management regarding her leadership, organization, time-management, and general competency to undertake the specialized tasks required of her position. (*See, e.g.*, FY 2007 Performance Appraisal; Feb. 2008 Mem.; FY 2008 Performance Appraisal.) But plaintiff has failed to rebut the Secretary's explanation. In fact, the only evidence that arguably relates in any way to plaintiff's religion are two remarks by plaintiff's supervisors: Ms. Baird-Bridge's comment to plaintiff during the June 25, 2007 meeting that "If [she] had known during the interview" that plaintiff could not work on Friday evenings and Saturdays, she "would have made other arrangements" (Dunn Dep. at 46), and Ms. Blake-Green's October 2008 question asking Serge Louis, a Jehovah's Witness, whether he was "one of those who can't work on Friday evenings and Saturdays." (2009 Louis Aff. at 1.)

While these statements in June 2007 and October 2008 may be offensive, they do not suffice to rebut the defendant's legitimate, non-discriminatory reasons for the March 2009 PIP, the May 2009 denial of a within-grade pay increase, and plaintiff's June 2009 reassignment. First, plaintiff does not argue (and has thus waived the contention) that these comments amount to "direct evidence" of religious discrimination that would entitle her to a trial. And even if plaintiff had raised that argument, it would fail because the remarks are insufficiently connected to the adverse actions in this case to constitute "direct evidence" of discrimination. *See Hampton v. Vilsack*, 760 F. Supp. 2d 38, 51 (D.D.C. 2011) ("[S]tray remarks, even those made by a supervisor, are insufficient to create a triable issue of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff." (internal quotation marks

omitted)), *reconsideration denied*, 791 F. Supp. 2d 163 (D.D.C. 2011), *and aff'd*, 685 F.3d 1096 (D.C. Cir. 2012); *see also Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 96 (1st Cir. 1996) ("[A]t a minimum, direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself.").

Of course, such "stray remarks may be probative of discrimination." *Isse*, 540 F. Supp. 2d at 30. However, the comments cited by plaintiff lack *any* temporal or substantive relationship to the PIP, the denial of the within-grade pay increase, or the reassignment. Both comments occurred more than five months before the closest respective challenged adverse action and were made in contexts completely unrelated to those actions. Further, beyond those two comments, plaintiff presents no evidence of discriminatory intent.

Instead, plaintiff relies exclusively (save the two comments addressed above) on her own subjective assessment of her job performance, as well as statements from her subordinates and from colleagues that worked with, but not within, her department, to attempt to rebut her supervisor's evaluations of her performance. (*See* Pl.'s Opp'n at 25-26.) But the Court is not "a super-personnel department that reexamines an entity's business decisions." *See Adeyemi*, 525 F.3d at 1227. And it is established that a "[p]laintiff cannot establish pretext simply based on her own subjective assessment of her own performance." *Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002). This is so because a "plaintiff's perception of himself, and of his work performance, is not relevant. It is the perception of the *decisionmaker* which is relevant." *Smith v. Chamber of Commerce of U.S.*, 645 F. Supp. 604, 608 (D.D.C. 1986). For this same reason, the statements of plaintiff's subordinates, as well as her colleagues working outside of her department, to the extent that they

reflect their opinions of plaintiff's job performance, are irrelevant as well. *See Mastrangelo v. Nat'l R.R. Passenger Corp.*, 2006 WL 416181, *7 (D.D.C. Feb. 22, 2006) ("[I]t is the supervisor's perception of the employee that is relevant, not the perceptions of his coworkers.").

Accordingly, the Court concludes that plaintiff has failed to produce sufficient evidence for a reasonable jury to conclude that any of the adverse actions at issue were motivated by religiously discriminatory animus, and thus, it will grant summary judgment on plaintiff's religious discrimination claims.

## IV.    RETALIATION

Plaintiff also contends that defendant retaliated against her for her verbal complaint to Mr. Wilson around July 2007 about the "way she was being treated" by her superiors, and plaintiff's response memorandum to the PIP, given to Ms. Blake-Green sometime after March 17, 2009.[7]  (Pl.'s Opp'n at 34-35.)  Plaintiff contends that she was retaliated against for taking these allegedly protected activities through the following actions:  (1) her FY 2007 Performance Appraisal; (2) her February 2008 "supervisory concerns" memorandum; (3) her placement on the PIP; (4) the denial of her within-grade increase; and (5) her reassignment to a non-supervisory position.  (*Id.* at 34-36.)  The Secretary again argues that many of the actions challenged by plaintiff are not "materially adverse," and that the actions were not retaliatory, but rather were based on plaintiff's "repeated failure[s]" to improve her job performance.  (Def.'s Mem. at 40.)

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a

_____

[7] The Court notes that there is no evidence in the record as to the exact date of either of plaintiff's alleged protected activities, nor is it even apparent why these events constitute protected activity, as opposed to mere complaints about the way plaintiff was being treated by her supervisors.  (*See infra* n.10.)

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To succeed on a retaliation claim, a plaintiff must establish that "(1) that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by his employer," *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (defining the prima facie case); and (3) that "his . . . protected activity was a but-for cause of the . . . adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *see also Baloch,* 550 F.3d at 1198.

The *McDonnell Douglas* burden-shifting framework also applies to retaliation claims. *Gaujacq v. EDF, Inc.,* 601 F.3d 565, 577 (D.C. Cir. 2010). Therefore, as in the discrimination context, if defendant asserts a legitimate, non-retaliatory explanation for the alleged material adverse actions, "the district court should . . . proceed[] to the ultimate issue of retaliation *vel non* instead of evaluating whether [plaintiff] made out a prima facie case." *Jones*, 557 F.3d at 678. At that stage, the only question for the court is "'whether a reasonable jury could infer . . . retaliation from all the evidence,' which includes not only the prima facie case but also the evidence the plaintiff offers to 'attack the employer's proffered explanation for its action' and other evidence of retaliation." *Id.* at 677 (quoting *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (internal quotation marks omitted)); *see also id.* at 678 ("[T]he only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation 'either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983))).

Again, however, a plaintiff may bypass altogether the *McDonnell Douglas* framework by presenting direct evidence of retaliation, and the existence of such evidence in itself defeats a

motion for summary judgment and takes the case to the jury. *See Swierkiewicz,* 534 U.S. at 511; *McGill,* 203 F.3d at 845.

A.    **Materially Adverse Action**

Title VII's retaliation provision is broader than the substantive antidiscrimination provisions in that it is "'not limited to discriminatory actions that affect the terms and conditions of employment,'" but rather "prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Thompson v. North American Stainless, LP,* 131 S. Ct. 863, 868 (2011) (quoting *Burlington N. & Santa Fe R. Co. v. White,* 548 U.S. 53, 64, 68 (2006)).   Because the retaliation provision's "materially adverse action" requirement is broader, the actions that constitute "adverse employment actions" for plaintiff's discrimination claims – the PIP, the denial of the within-grade increase, and the reassignment – also necessarily constitute "materially adverse actions."

However, plaintiff's FY 2007 Performance Appraisal and the February 2008 "supervisory concerns" memorandum do not rise to the level of a materially adverse action.  A materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern,* 548 U.S. at 68 (internal quotation marks omitted).  This Circuit has interpreted *Burlington Northern* to require that an employment-related action challenged as retaliatory must "result in materially adverse consequences affecting the terms, conditions, or privileges of the plaintiff's employment." *Pardo–Kronemann v. Donovan,* 601 F.3d 599, 607 (D.C. Cir. 2010) (internal quotation marks omitted).  "For employment actions that do not obviously result in a significant change in employment status – such as giving a poor performance evaluation, reassigning office space and equipment, or, for that matter, fielding a company softball team – an employee must go the

further step of demonstrating how the decision nonetheless caused such an objectively tangible harm." *Douglas*, 559 F.3d at 553; *see also Baloch*, 550 F.3d at 1199 (explaining that poor performance reviews "typically constitute adverse actions only when attached to financial harms").[8]  Plaintiff offers no evidence that either the FY 2007 Performance Appraisal or the February 2008 memorandum affected her salary or was otherwise attached to financial harm or objectively tangible harm.  Thus, a reasonable jury could not find that either action rises to the level of a materially adverse action for purposes of a Title VII's retaliation claim.

### B.  Retaliation *vel non*

The Secretary again defends the PIP, the denial of plaintiff's within-grade increase, and plaintiff's ultimate reassignment on the grounds that plaintiff had consistently failed to perform at a level commensurate with the responsibilities of her position.  (Def.'s Mem. at 40.)  Because the defendant offers this legitimate, non-retaliatory rationale for his actions, the only question for the court on summary judgment is "'whether a reasonable jury could infer . . . retaliation from all the evidence.'"  *Pardo–Kronemann,* 601 F.3d at 604.

As with her discrimination claim, plaintiff fails to provide evidence sufficient for a jury to infer retaliation.  The only additional potentially relevant evidence available to plaintiff for her retaliation claim is the temporal proximity between her alleged protected activities and the alleged retaliatory actions.[9]  In this regard, the May 7, 2009 denial of plaintiff's within-grade

---

[8] Another district judge has observed that when – as here – the alleged retaliatory actions are employment-related, the standard for a materially adverse action "is functionally identical to that in the discrimination context."  *Morrison v. Mills*, 928 F. Supp. 2d 241, 247 (D.D.C. 2013) (citing *Pardo-Kronemann*, 601 F.3d at 607).

[9] The Court notes, however, that not all of the alleged retaliatory actions bear any temporal proximity to plaintiff's alleged protected activities.  For instance, plaintiff's complaint to Mr. Wilson around July 2007 predated the PIP by at least twenty months, and plaintiff's response memorandum to her PIP *post*-dated the PIP.  Accordingly, there is *no* temporal proximity between any alleged protected activity and the PIP to suggest a retaliatory motive.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268,

increase, and plaintiff's June 22, 2009 reassignment to a non-supervisory role post-date the plaintiff's response to the PIP by at most one-and-a-half and three months, respectfully. Temporality alone may suffice to support a prima facie case of retaliation if the protected activity and alleged retaliatory act are "very close" in time. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012). However, once a defendant has proffered a legitimate, non-discriminatory rationale for the challenged actions, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *see also Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (holding that "an inference of retaliatory motive based upon the 'mere proximity'" of two-and-a-half months is untenable on a record otherwise lacking evidence of retaliatory motive). Given that plaintiff offers no other evidence beyond temporality of a causal connection, much less a *but-for* causal connection, *Univ. of Texas Sw. Med. Ctr.*, 133 S. Ct. at 2534, between her alleged protected activity and the challenged actions, the Court concludes that no reasonable jury could infer retaliation, and will grant summary judgment on plaintiff's retaliation claims. *See Johnson v. Bolden*, 699 F. Supp. 2d 295, 301 (D.D.C. 2010) ("[T]he mere proximity of two and a half months between plaintiff's June 2004 meeting with Jennings and the alleged adverse actions is insufficient to demonstrate causality.").[10]

---

274 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); *Lewis v. Dist. of Columbia*, 653 F. Supp. 2d 64, 79 (D.D.C. 2009) ("The fact that the allegedly retaliatory actions preceded the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff.").

[10] The Court also notes that, even though not raised by the defendant, plaintiff has not provided evidence that she engaged in any "protected activity" during the time relevant to this action. "An activity is 'protected' for the purposes of a retaliation claim if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment. " *Lemmons*, 431 F. Supp. 2d at 91 (internal quotation marks omitted); *see* 42 U.S.C. § 2000e-3(a). "While no 'magic

## CONCLUSION

For the foregoing reasons, this Court will **GRANT** the Secretary's motion for summary judgment [Dkt. No. 16]. An Order accompanying this Memorandum Opinion will be filed on this day.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE: October 7, 2013

---

words' are required," for a complaint or opposition activity to be "protected," in the least it "must in some way allege unlawful discrimination, not just frustrated ambition." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). Here plaintiff's two alleged "protected activities" – the verbal complaint to Mr. Wilson and her response to the PIP – fall short of the *Broderick* standard because there is no evidence that in either complaint plaintiff alleged discrimination on the basis of religion. Mr. Wilson recounted only that plaintiff "did verbally notify me that she was subject to unwelcome, offensive, and unprofessional behavior by Anne Baird-Bridges." (Wilson Aff. at 5). Similarly, plaintiff's response to the PIP alleged "consistent[] harass[ment] on the job" (PIP at 11), but nowhere alleged that the harassment was based on her religion. *See Hunter v. Dist. of Columbia*, 905 F. Supp. 2d 364, 379 (D.D.C. 2012) (complaint letter including the word "discriminatory practices" but not alleging discrimination on the basis of a protected status did not constitute a protected activity); *Peters v. Dist. of Columbia*, 873 F. Supp. 2d 158, 204-05 (D.D.C. 2012) (complaints about supervisor conduct and "poor evaluations" did not constitute protected activity absent an allegation of unlawful discrimination); *Beyene v. Hilton Hotels Corp.*, 815 F. Supp. 2d 235, 247 (D.D.C. 2011) (complaint about supervisory harassment did not constitute protected activity absent allegation that harassment was based on protected status).

　　Of course, plaintiff's informal EEO complaint constitutes the core type of activity protected under Title VII. *See Singletary v. Dist. of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003). However, plaintiff's EEO complaint *post-dates* all of the defendant's allegedly retaliatory actions. Thus, there is no evidence that plaintiff's EEO complaint caused the alleged retaliatory acts. *See Lewis*, 653 F. Supp. 2d at 79.